## JAMES H. RIGGIN *v.* BERNARD KENDIG.

When the death of a slave is necessarily connected with and a direct sequence of the vice of character, it can then be no more regarded as a fortuitous event than a death which results from a vice of body.

*Held:* That value of a slave could be recovered where the slave was a notorious runaway, and died of a disease contracted while a runaway, and which was a consequence of exposure in the woods and the eating of indigestible food.

APPEAL from the Fourth District Court of New Orleans, *Reynolds,* J.
J. J. *Michel,* for plaintiff and appellant. *Thomas J. Semmes,* for defendant.

COLE, J. This suit is instituted to recover the price of a slave and damages, on the ground that he died of a disease acquired while a runaway, and which was the consequence of exposure in the woods and eating indigestible food.

The evidence establishes that the slave *Dick* was a notorious runaway previous to the sale from defendant to plaintiff; that *Kendig* is a negro trader, and bought *Dick* of one *Loupe,* also of the same calling, who knew him to be a runaway.

We think that *Kendig* was cognisant of this vice of *Dick* when he sold him, fully guaranteed to plaintiff. They were both negro traders of the city, and that class of society is not easily imposed upon. Plaintiff charges him in the petition with a knowledge of the fact, and in support of the charge avers that he bought *Dick* from *Loupe* without warranty and with full knowledge of the existing vice.

When this cause was fixed for trial, the plaintiff, in order to prove the averment, notified *Kendig* to bring into court his bill of sale from *Loupe.* On the day of trial he produced a deed of sale from *Loupe* with full warranty, but on examination it was found to be a sale of a different slave, whereupon *Kendig* made an affidavit, in which he states that he delivered the bill of sale to his counsel supposing it to be the bill of sale for *Dick;* that when his counsel pointed out the error he carefully examined his papers, and could not find it. He believes it to be lost or mislaid, and that he generally gives up his private bills of sale to the notary when he sells.

Now in this affidavit he does not pretend to have ever bought the slave with warranty, yet that was the point in controversy, and one which his own interest made it his duty to declare upon.

As the sale from *Loupe* to *Kendig* was a private act, and as he swears he was accustomed to give his private bills of sale to his notary, why did he not make a search among the records of that officer in the city of New Orleans?

Defendant did not cause *Loupe* to be cited to defend the warranty, which he pretends to have received from him. He prays in his answer that he be cited in warranty, but this is all that was done.

RIGGIN
*v.*
KENDIG.

It is not natural to suppose defendant would incur the risk of losing upwards of one thousand dollars if he had a warrantor to protect him.

Defendant was aware at the time of the sale of *Dick* to plaintiff that he was affected with the redhibitory vice of being a runaway, and is liable to plaintiff in the event the death of *Dick* was caused by exposure and bad food from being a runaway.

Before alluding to the testimony as to the cause of his decease, we will dispose of the following bill of exceptions taken by defendant to the ruling of the lower court: "Be it remembered, that on the trial of this cause the defendant's counsel having asked *Dr. Browning*, on cross-examination, how long the boy had been sick when he was called upon to attend him, replied that he did not know except from what the boy told him: on then being asked how long the boy told him he had been sick, said that the boy informed him he had been sick two or three weeks; then, on re-examination, plaintiff asked the witness to what cause the boy ascribed his sickness, to which question defendant objected, on the grounds that the declarations of the slave were not evidence, and that the question propounded had no reference to an explanation of the question prounded by defendant, which was merely directed to the length of time the boy had been sick, and not as to the nature or origin of his disease. The court overruled the defendant's objection, because of the question asked on cross-examination, and admitted the testimony, thereupon the defendant objected, and tendered this his bill of exceptions, which is signed this 29th May, 1856."

We consider that the objections in this bill are not well taken, for the following reasons:

When an illegal interrogatory is propounded to a witness as to what a third party said, if the answer thereto will have a direct effect on the decision of the suit, then it is lawful for the opposite party to propound interrogatories, not only with reference to an explanation of the question already presented, but also as to anything else that this third party said, which would have the effect of rebutting the conclusion that might be drawn from the response to the first illegal interrogatory, provided the questions allude to the same conversation.

If in this case the answer to the interrogatory of defendant was allowed to stand alone, then as the boy said he had been sick two or three weeks, his death might be ascribed to a fortuitous event, (C. C. 2511,) and defendant would not be responsible. As defendant thought proper to propound a question, the answer to which affects the principal issue in this case, the adverse party had the right to ask any questions relative to the same conversation, which might destroy the effect of the first illegal interrogatory.

The answer of witness to the question: "to what cause the boy ascribed his sickness?" was as follows: "At the same time *Dick* told him how long he had been sick, he informed him that he had been laying exposed in a shanty in the woods for three or four weeks, and sick in that shanty. He did not say where that shanty was, but said it was back in the woods."

In this case then it appears that the slave informed *Dr. Browning* that he had been lying exposed in the woods at the same time that he told him he had been sick. Notwithstanding then the illegality of the testimony of slaves when used against white persons, and also that of hear-say testimony, as defendant first propounded the illegal interrogatory, the effect of the answer to

which affected the main issue, we consider plaintiff had the right to rebut the effect of that answer by questions as to other parts of the same conversation, the answers to which would have such effect.

The lower court then properly overruled the objections to the interrogatory set forth in the bill of exceptions.

Having shown that defendant must have been aware of the existence in the slave of the redhibitory vice of running away at the time he sold him to plaintiff, and having disposed of the bill of exceptions, the sole question that remains for our consideration is, whether the death of *Dick* was produced by a disease contracted from exposure and bad food from being a runaway.

The evidence establishes that *Dick* was absent as a runaway for three or four months previous to the period of his death, to wit: from March to July, 1855, when he was brought in a dying condition to the house of *Mrs. Emanuel;* that *Dr. Browning* was sent for, and he died in about three days of inflammation of the bowels.

*Dr. Browning* testifies that "inflammation of the bowels is caused from exposure to dampness, cold, eating indigestible food, and various other causes. Should think that a negro, having run away from his master and gone into the back of the woods, living in dampness, would be very likely to contract such disease, as well as many others."

Although this slave may have died of a disease not produced from being a runaway, still as it is established that he was a runaway for a long time previous to the sale to the plaintiff—that defendant must have been aware of this redhibitory vice, and concealed it from plaintiff—that he was a runaway for three or four months previous to his death—that he died of inflammation of the bowels, which is sometimes caused by exposure to dampness, cold and eating indigestible food; and as this slave had been lying sick and exposed in a shanty in the woods for three or four weeks, we conclude that under this state of facts this slave must be considered as having died of a disease contracted by exposure and want of proper food whilst a runaway—that as this disease was a direct consequence of a vice existing before and at the time of the sale, that plaintiff has the right to recover in this suit.

A sufficient cause for the death from a disease, which may be considered a direct consequence of a redhibitory vice, having been established by plaintiff, it is reasonable, under the circumstances of this case, to attribute the disease to causes known to be adequate, such as exposure and want of digestible food, rather than to some imaginary cause which might make his death a fortuitous event.

The case of *Kiper* v. *Nuttall*, 1 Rob. 46, does not conflict with our view in the present suit. In that action it was not proved that the death resulted from a disease which either existed or was the consequence of one existing at the time of the sale, and therefore the decease of the slave was a fortuitous event within the meaning of Art. 2511 of the Civil Code.

We consider that whenever the death may be viewed as a direct sequence of the redhibitory vice, then the death cannot be deemed a fortuitous event. For example, if a slave is sold who is unsound of mind, and in a fit of insanity kills himself, his death is a direct result of the redhibitory vice, and cannot be viewed as a fortuitous event in the sense of the statute.

If a slave has the redhibitory vice of running away, and whilst in the act attempts to swim a river and is drowned, his death is not a fortuitous event

within the meaning of Article 2511 C. C., but is a direct consequence of the vice of running away.

Article 2500 C. C. divides the latent defects of slaves into two classes: vices of body and vices of character. Now if death, resulting from a disease existing at the time of the sale, is not a fortuitous event, why should a death which is the direct consequence of a vice of character be considered a fortuitous event? We think that whenever the death of the slave is necessarily connected with and a direct sequence of the vice of character, it can then be no more regarded as a fortuitous event than a death which results from a vice of body.

It is established that a slave like *Dick,* having no vices and defects, was worth a thousand dollars and upwards in July, 1855. We consider that plaintiff is entitled to recover of defendant $1000, with legal interest from judicial demand, August 8th, 1855.

It is, therefore, ordered, adjudged and decreed, that the judgment of the lower court be avoided and reversed, and proceeding to render such judgment as ought to have been rendered by the lower court: It is ordered, adjudged and decreed, that plaintiff recover of defendant one thousand dollars, with five per cent, interest from the eighth day of August, eighteen hundred and fifty-five, and costs of both courts.

BUCHANAN, J. I concur in the decree reversing the judgment of the District Court, on the ground that the evidence convinces me that the slave *Dick* was addicted to the vice of running away, to the knowledge of defendant, at the time of his sale to plaintiff, and that the defendant concealed this vice of the slave from plaintiff.

The death of the slave *Dick* before the institution of the action has not, in my opinion, exonerated the defendant from liability. The slave was brought home to his master in a dying condition, from a disorder contracted and aggravated to an incurable degree by exposure to the inclemency of the weather in the woods while runaway. I think it may be fairly said that the slave, in the words of Article 2510 of the Code, has perished through the badness of his quality.

The French text of the Article is, "si la chose vendue a péri par suite de sa mauvaise qualité." By *bad quality* in this Article I understand to be meant *redhibitory vice.* If, then, the death can be traced to a redhibitory vice with which the slave was affected at the time of the sale—if the death was the consequence (la suite) of such vice—the loss must fall upon the seller.

I think the evidence in this case clearly shows the death of *Dick* to have been the consequence of the redhibitory vice of running away. In this respect the case differs from that of *Kiper* v. *Nuttall,* 1 Rob. 46, where the disease of which the slave died could not be traced to and had no connection with that under which she was laboring at the time of her sale—the only redhibitory malady.

SPOFFORD, J., dissenting. "If the thing affected with the vices has perished through the badness of its quality, the seller must sustain the loss." C. C., Art. 2510.

"If it has perished by a fortuitous event, *before the purchaser has instituted his redhibitory action,* the loss must be borne by him." C. C. 2511.

The slave in this case perished before the action was brought. He died of an inflammation of the bowels, an acute disease, which attacked him for the first time.

The cause of the disease rests upon conjecture. And the law looks not to remote possible or conjectural causes more than eight months after the sale, but to those which are proximate and certain.

It seems to me that this slave did not die of the habit of running away, or "through the badness of his quality," but perished by a fortuitous event in the sense of the Code, and therefore I think the purchaser should bear the loss. *Kiper* v. *Nuttall*, 1 Rob. 46.

VOORHIES, J., concurring.